FILED
11/27/24 9:29 am
CLERK
U.S. BANKRUPTCY
COURT - WDPA

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re: | : | Case No. 22-21448-GLT |
| | : | Chapter 11 |
| **BLACK DIAMOND ENERGY OF DELAWARE, INC.,** | : | |
| | : | |
| *Debtor.* | : | |
| | : | |
| **BLACK DIAMOND ENERGY OF DELAWARE, INC.,** | : | |
| | : | |
| *Movant,* | : | Related to Dkt. Nos. 154, 176 |
| | : | |
| v. | : | |
| | : | |
| **WYOMING OIL AND GAS CONSERVATION COMMISSION,** | : | |
| | : | |
| *Respondent.* | : | |
| | : | |

Donald R. Calaiaro, Esq.                 Stephanie A. Sneesby, Esq.
David Z. Valencik, Esq.                   Brian Marvel, Esq.
Calaiaro Valencik                          Wyoming Attorney General's Office
Pittsburgh, PA                             Casper, WY
*Attorneys for the Debtor*                *Attorneys for the Commission*

### <u>MEMORANDUM OPINION</u>

Hours after Black Diamond Energy of Delaware, Inc. ("Debtor") commenced this case, the Wyoming Oil and Gas Conservation Commission (the "Commission") sealed its oil and gas wells due to the Debtor's noncompliance with the Commission's prepetition orders. A year later, the Debtor moved to enforce the automatic stay and recover damages ("Motion")[1] after the Commission re-sealed wells that the Debtor continued to operate with impunity. The Commission objected, asserting that its actions were excepted from the stay under section 362(b)(4) of the

---

[1] *Amended Expedited Motion to Enforce the Automatic Stay and Request for Sanctions*, Dkt. No. 154.

Bankruptcy Code[2] as an exercise of its police and regulatory powers.[3]  Layers of complexity aside, the dispute boils down to this: the Debtor argues that the Commission seeks to extract monetary penalties arising from a tax dispute; the Commission contends that it is enforcing coercive measures, including the provision of a bond, to ensure the Debtor's future compliance with its rules and orders.  For the reasons below, the Court will deny the *Motion*.

## I.    BACKGROUND

The Debtor produces oil and gas from thirteen wells leased from the United States Department of Energy in Sublette County, Wyoming.[4]  Eric Koval is the principal of the Debtor and a similarly named non-debtor entity.[5]  The Commission is the state regulatory body for the oil and gas industry,[6] vested with the jurisdiction and authority "necessary to effectuate the purposes and intent" of the Oil and Gas Conservation Act ("Act").[7]  It manages the production of these resources to prevent waste and environmental damage, protect "correlative rights,"[8] and collect assessments on the production and sale of oil and gas.[9]  The parties agree that Commission staff

---

[2]    Unless expressly stated otherwise, all references to "Bankruptcy Code" or to specific sections shall be to the Bankruptcy Reform Act of 1978, as amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), Pub. L. No. 109-8, 119 Stat. 23, 11 U.S.C. § 101, *et seq*. All references to "Bankruptcy Rule" shall be to the Federal Rules of Bankruptcy Procedure.

[3]    *Wyoming Oil & Gas Conservation Commission's Objection to Debtor's Amended Expedited Motion for Order to Enforce Automatic Stay and Request for Sanctions*, Dkt. No. 176.

[4]    *Amended Expedited Motion to Enforce the Automatic Stay and Request for Sanctions*, Dkt. No. 154 at ¶¶ 5-7.

[5]    *Declaration of Eric Koval*, Dkt. No. 376 at ¶ 2.

[6]    *Declaration of Joe Scott*, Dkt. No. 368 at ¶ 4.

[7]    See Wyo. Stat. Ann. § 30-5-104.

[8]    Essentially, "correlative rights" are the opportunity of property owners to produce an equitable share from an underground reservoir of oil or gas beneath multiple properties.  See Wyo. Stat. Ann. § 30-5-101(a)(iii), (ix).

[9]    See Kerr-McGee Corp. v. Wyoming Oil & Gas Conservation Comm'n, 903 P.2d 537, 541-42 (Wyo. 1995); Union Pac. Res. Co. v. Texaco, Inc., 882 P.2d 212, 223 (Wyo. 1994) (observing that the Act provides a "comprehensive regulatory program which prevents the waste of Wyoming's oil and gas resources and protects the correlative rights of property owners.").

physically "sealed" the Debtor's wells post-petition, and then re-sealed them one year later while fully aware of this bankruptcy. While the salient facts are undisputed and the issues appear straightforward, this matter is deceptively convoluted.

This *Motion* was initially submitted on the pleadings, but the Debtor later requested an evidentiary hearing after both sides began filing supplemental exhibits.[10] Ultimately, five witnesses offered declarations in lieu of direct testimony and appeared for cross-examination: Mr. Koval;[11] Joseph Breznai (the Debtor's former Chief Operating Officer);[12] Peter Dochinez (the holder of a lien on the Debtor's assets);[13] Patrick Amole (the Commission's Deputy Supervisor);[14] and Joe Scott (the Commission's Natural Resources Supervisor).[15] Neither Mr. Breznai nor Mr. Dochinez provided relevant testimony.[16] Similarly, only a fraction of the 64 exhibits admitted into evidence were referenced during testimony.[17]

The record amply establishes a history of bad blood between the Debtor and the Commission dating back more than a decade. By 2020, the Debtor and a related entity, Black Diamond Energy, Inc. (sometimes called Black Diamond Energy of Wyoming) lost the right to operate non-federal wells in Wyoming.[18] The Commission found that they did not comply with

---

[10]   See *Response to Order Setting Status Conference*, Dkt. No. 216 at ¶¶ 5-10.

[11]   See *Declaration of Eric Koval*, Dkt. No. 376.

[12]   *Declaration of Joseph Breznai*, Dkt. No. 374 at ¶ 4.

[13]   *Declaration of Peter Dochinez*, Dkt. No. 375 at ¶ 3

[14]   *Declaration of Patrick Amole*, Dkt. No. 369 at ¶ 2.

[15]   *Declaration of Joe Scott*, Dkt. No. 368 at ¶ 2.

[16]   The Court notes, however, that Mr. Breznai's testimony regarding a 2017 hearing before the Commission was materially inconsistent with the transcript of that hearing. Cf. *Transcript of April 24, 2024 Hearing*, Dkt. No. 392 at 12:11-24 with *Exhibit 10* at 10-12. Therefore, even if his testimony was relevant, it is not credible.

[17]   Unless otherwise noted, the Court has not reviewed or considered any exhibit not specifically identified by the parties.

[18]   See *Transcript of April 24, 2024 Hearing*, Dkt. No. 392 at 26:17-29:5; *Declaration of Joe Scott*, Dkt. No. 368 at ¶¶ 20-22; *Proposed Stipulated Facts*, Dkt. No. 249-1 at ¶ 2.

3

applicable rules and through separate proceedings ordered their state wells to be permanently "plugged" with cement.[19]  This resulted in the forfeiture of their bonds ($274,000 in 2014 and another $75,000 in 2017) to plug the "orphaned" wells.[20]  Believing that the bonds far exceeded the actual plugging costs,[21] the Debtor unsuccessfully sought an accounting from the Commission and pursued litigation to recover the bonded funds.[22]

Meanwhile, as an oil and gas operator in Wyoming, the Debtor was required to report its production, sales, and corresponding conservation tax liability to the Commission semi-annually and pay any amount due.[23]  For the first half of 2020, the Debtor submitted its tax form several months late and reported production, but no sales.[24]  Its submission for the second half of 2020 was also months late, but this time reported sales with a conservation tax of roughly $53 due.[25]  But rather than pay the tax, the Debtor expressly demanded an offset on the tax form:

> Black Diamond Energy of Delaware, Inc. had $181,670 Converted on October 19, 2011 by the State of Wyoming, determined in Court Order CV-2017-074 of October 16, 2018.  To date the State of Wyoming and its Attorney General has refused to give an accounting for these monies unlawfully taken.  Under advice from counsel, the balance with 7% interest thereon due [Black Diamond]

---

[19] Id.; see also *Transcript of April 24, 2024 Hearing*, Dkt. No. 392 at 51:1-5 (explaining that "plugging" renders a well permanently operable).

[20] *Transcript of April 24, 2024 Hearing*, Dkt. No. 392 at 26:17-29:5.

[21] See *Exhibit 20*.

[22] See *Transcript of April 24, 2024 Hearing*, Dkt. No. 392 at 28:16-29:17; *Declaration of Joseph Breznai*, Dkt. No. 374 at ¶ 10; see also Black Diamond Energy of Delaware, Inc. v. Wyoming Oil & Gas Conservation Comm'n, No. 2018-0011, 2019 WL 13130212, at *1 (Wyo.Dist. Mar. 11, 2019) and Black Diamond Energy of Delaware, Inc. v. Wyoming Oil and Gas Conservation Comm'n, No. 2017-0074, 2019 WL 13130213, at *1 (Wyo.Dist. Mar. 11, 2019), aff'd, Black Diamond Energy of Delaware, Inc. v. Wyoming Oil & Gas Conservation Comm'n, 2020 WY 45, 460 P.3d 740 (Wyo. 2020).

[23] See Wyo. Stat. Ann. § 30-5-116(b); see also *Exhibit 2* at 2 (citing Oil & Gas Conservation Comm'n Rules, Ch. 3, §§ 13, 41); *Exhibit 6* at 2.

[24] *Exhibit 2* at 2-3; *Exhibit 6* at 2.

[25] *Exhibit 2* at 3.

from the State of Wyoming SHALL be used as offset in paying fee's
(sic), taxes and this conservation tax.[26]

Consequently, the Debtor's "improper[]" reporting and failure to pay taxes prompted the Commission to schedule a contested hearing and threaten punitive action for the alleged violations of the Commission's rules.[27]

Prior to the hearing, the Debtor amended its tax form and paid the tax under protest.[28] The Commission staff then discovered inconsistencies in the information the Debtor reported to the Commission, the Bureau of Land Management ("BLM"), Sublette County, and the Wyoming Department of Revenue.[29] Unable to verify the accuracy of the Debtor's 2020 tax forms, the discrepancies were presented at the April 2021 contested hearing to help establish the Debtor violated the Commission's rules.[30] Following the hearing, the Commission entered an order ("Order 205-2021") that required the Debtor to: (1) pay a $5,000 fine for its rule violations; (2) "post a surety bond or other guaranty in the amount of $25,000, *as security for its future compliance with the Commission's Rules and orders*"; and (3) provide accurate production and sales reports, update its tax forms, and pay any taxes due.[31]

The Debtor appealed *Order 205-2021* in the District Court of the State of Wyoming, County of Natrona, 7th Judicial District ("State Court"), but it was affirmed in January 2022.[32] The State Court's decision is notable in three respects. First, while acknowledging the Debtor's statutory right to dispute conservation taxes, the State Court found the Debtor went about

---

[26] Id.

[27] Id.

[28] Id. at 4.

[29] Id.; *Exhibit 6* at 3.

[30] Id.

[31] *Exhibit 2* at 6-7; *Proposed Stipulated Facts*, Dkt. No. 249-1 at ¶ 4 (emphasis added).

[32] *Exhibit 5*; *Proposed Stipulated Facts*, Dkt. No. 249-1 at ¶ 6.

it the wrong way and in the wrong forum.[33]   Second, it concluded that the unsubstantiated offset claim was irrelevant to whether the Debtor timely filed the proper paperwork and paid conservation taxes.[34]   Third, the State Court determined the Commission did not exceed its statutory authority or act capriciously by requiring the Debtor to post a compliance bond.[35]

In April 2022, the Commission ordered the Debtor to show cause why its wells should not be sealed due to its failure to comply with *Order 205-2021*.[36]   Mr. Scott also contacted Mr. Koval to emphasize the need for the Debtor to pay the fine and post the required bond before the hearing.[37]   Neither occurred and no one appeared on behalf of the Debtor.[38]   Curiously, Mr. Koval testified that he did not attend the show cause hearing "[b]ecause it was an enforcement of an order that we were already in compliance with."[39]   On July 21, 2022, the Commission entered an order ("Order 459-2022") authorizing staff to seal the Debtor's wells and imposing a monthly $5,000 fine to compel compliance with *Order 205-2021*.[40]

On July 25, 2022, Mr. Scott emailed Mr. Koval a copy of *Order 459-2022* and informed him that Commission staff would be sealing the Debtor's wells the next day.[41]   Before that could occur, the Debtor filed a chapter 11 petition on July 26, 2022, commencing this case in the Western District of Pennsylvania.[42]   The Commission did not receive notice of the bankruptcy

---

[33]      *Exhibit 6* at 9-10.

[34]      Id. at 10.

[35]      Id. at 11-12 (citing Wyo. Stat. Ann. § 30-5-104(d)(i)(D)).

[36]      *Proposed Stipulated Facts*, Dkt. No. 249-1 at ¶ 7.

[37]      Id. at ¶ 8; *Exhibit 4* at 3; *Declaration of Joe Scott*, Dkt. No. 368 at ¶¶ 25-26.

[38]      *Proposed Stipulated Facts*, Dkt. No. 249-1 at ¶ 9; *Exhibit 4* at 4.

[39]      *Transcript of April 24, 2024 Hearing*, Dkt. No. 392 at 34:14-21.

[40]      *Exhibit 4* at 5.

[41]      *Exhibit 21*.

[42]      *Proposed Stipulated Facts*, Dkt. No. 249-1 at ¶ 11.

filing until August 1, 2022,[43] so staff, including Mr. Amole, proceeded to physically seal the

Debtor's wells as planned.[44]   BLM representatives were present and aware of the Commission's

actions.[45]

Mr. Amole explained that a "seal" is like an anti-tamper device and does not prevent

production.[46]   A well is "sealed" by placing a thin metal band with a warning label and unique

identification number through the valve.[47]   The label expressly states:

******* WARNING *******

This equipment has been sealed by order of the Wyoming Oil and
Gas Conservation Commission.

Removal of this seal, *operation of this equipment* or removal of this
equipment may result in monetary penalties and/or criminal
prosecution.[48]

Ideally, the seal will be damaged or severed if the valve is opened,[49] but variation in wellhead

construction may not permit a tamper-evident placement.[50]   Indeed, Mr. Amole testified that it was

apparent that some of the Debtor's wells could produce without removing or damaging the seals.[51]

---

[43]      *Exhibit 7*; *Declaration of Joe Scott*, Dkt. No. 368 at ¶ 29.  The Court recognizes that the Debtor asserts the Commission had notice prior to August 1, 2022.  Mr. Koval testified that he left after-hours voicemails with the Commission the night before and the evening after the petition was filed.  *Transcript of April 24, 2024 Hearing*, Dkt. No. 392 at 17:1-15.  Even if true, the Court finds no convincing proof that the Commission was aware of the bankruptcy petition when its staff installed the seals.  As a practical matter, however, the exact date is irrelevant to the outcome of this case.

[44]      *Declaration of Patrick Amole*, Dkt. No. 369 at ¶¶ 8-9.

[45]      *Transcript of April 24, 2024 Hearing*, Dkt. No. 392 at 57:1-13.

[46]      Id. at 46:3-15.

[47]      *Declaration of Patrick Amole*, Dkt. No. 369 at ¶ 8.

[48]      See *Exhibit 15* (emphasis added).

[49]      *Declaration of Patrick Amole*, Dkt. No. 369 at ¶ 8.

[50]      *Transcript of April 24, 2024 Hearing*, Dkt. No. 392 at 49:22-50:4, 58:4-15.

[51]      *Declaration of Patrick Amole*, Dkt. No. 369 at ¶ 10.

But according to Mr. Scott, even if a well can produce, a Commission order sealing the well renders any operation of the equipment impermissible.[52]

The next day, July 27, 2022, the Commission scheduled a September show cause hearing due to the Debtor's failure to pay severance and ad valorem taxes.[53]  Ironically, the threatened consequence was the sealing of the Debtor's wells, which seemingly reflects the initiation of a new proceeding rather than a continuation of one.[54]  The Commission ultimately continued the tax enforcement hearing generally, albeit three weeks after receiving notice of the Debtor's bankruptcy.[55]

The Debtor did not seek to enforce the automatic stay at this time.  The reason seems clear: there was no pressing concern or injury because the Debtor's wells kept producing.[56]  Mr. Koval admits as much, though it is unclear how the seals were neutralized.[57]  He testified that he did not remove or direct the removal of any seals, and "knows" (without any firsthand knowledge) that none were encountered when production resumed.[58]  Regardless, it was apparent from Mr. Koval's evasive and combative testimony that the Debtor intentionally defied *Order 459-2022* and ignored the seals:

> Atty. Marvel:    And in Mr. Scott's declaration, he states that on July 21st, 2022 there was an order issued by the Commission sealing the wells, do you have any basis to disagree with that and that date?

---

[52]    *Declaration of Joe Scott*, Dkt. No. 368 at ¶ 34.

[53]    *Proposed Stipulated Facts*, Dkt. No. 249-1 at ¶ 10.

[54]    Id.

[55]    Id. at 12.

[56]    *Transcript of April 24, 2024 Hearing*, Dkt. No. 392 at 37:7-21.

[57]    Id.

[58]    Id. at 16:2-25, 33:21-24, 37:4-7, 41:1-11; see also id. at 52:24-53:12 (Mr. Amole testifying that Randall Neilson told him that he did not remove any seals when he opened the wells).  Given the remote location of the wells, it is implausible that an unknown third-party removed unsealed wells.  Id. at 68:25-69:23.

| Mr. Koval: | I don't. |
|---|---|
| Atty. Marvel: | And so, you would agree with me, at least in respect to this, that on July 21st, 2022, you and your company were under an obligation not to produce by the order, is that correct? |
| Mr. Koval: | Again, we claimed offset.  You were holding our bonding money. |
| Atty. Marvel: | Not my—sir, not my question.  My question is, on July 21st, 2022, you were aware that you could not produce your wells by Commission order, correct? |
| Mr. Koval: | Incorrect.  Incorrect. |
| Atty. Marvel: | So, what you're going to say— |
| Mr. Koval: | *I declared that we were in compliance, and always have been in compliance* with the Wyoming State Lands and Investments, with Wyoming Oil & Gas Conservation Commission, with the BLM, *and we have never ever been out of compliance.*  We, quite frankly, have been railroaded here, from 2017 forward, from the Wyoming Oil & Gas Conservation Commission and prior, going back to 2011, by the Wyoming State Lands and Investments.[59] |

In fact, Mr. Koval vehemently insisted that the Commission's rules were inapplicable to federal wells and that the Commission lacked the authority to require a compliance bond from the Debtor.[60]

The Debtor defiantly reported its production to the Commission despite operating in contravention of the seals and *Order 459-2022*.[61]  Surprisingly, the Commission did not

---

[59]    Id. at 36:6-37:3 (emphasis added).

[60]    Id. at 32:5-14; 33:4-20.

[61]    *Declaration of Joe Scott*, Dkt. No. 368 at ¶¶ 32-33.

notice.[62]  In fact, the Commission only "discovered" the Debtor's continued operations when it was brought to Mr. Amole's attention by BLM representatives nearly a year later.[63]

On June 9, 2023, the Wyoming Attorney General's office wrote to Mr. Koval to inform him that they were aware of the Debtor's intentional violation of *Order 459-2022* (the "June Letter").[64]  They stated that the Commission would be re-sealing the wells within ten days and warned that the unauthorized removal of seals would subject those involved to civil penalties.[65]  The *June Letter* also explained that the Commission would remove the seals if the Debtor "achieves compliance" with *Orders 459-2022* and *205-2021*, but did not expound further.[66]

On June 14, 2023, an inspector replaced two missing seals, but muddy conditions prevented access to most of the other wells.[67]  A follow-up inspection occurred on July 5, 2023.[68]  Although no other seal replacements were necessary, Commission staff observed an unreported oil spill.[69]  Based on his experience, Mr. Scott estimated the spill to be three-times the Commission's spill reporting threshold.[70]  The Commission later learned of another spill occurring in May 2023 that was more than ten-times the Commission's reporting threshold, yet it was only reported to the BLM.[71]  Mr. Koval unconvincingly testified that he was unaware that such spills

---

[62]   Id.; *Transcript of April 24, 2024 Hearing*, Dkt. No. 392 at 73:23-74.  The oversight reportedly occurred because the Commission's reporting system is old and not designed to flag disobedient producers.  Id.

[63]   *Declaration of Patrick Amole*, Dkt. No. 369 at ¶ 10.

[64]   *Exhibit 8*.

[65]   Id.

[66]   Id.

[67]   *Declaration of Patrick Amole*, Dkt. No. 369 at ¶ 13; *Transcript of April 24, 2024 Hearing*, Dkt. No. 392 at 73:23-74:5

[68]   *Declaration of Patrick Amole*, Dkt. No. 369 at ¶ 14.

[69]   *Declaration of Joe Scott*, Dkt. No. 368 at ¶ 15; *Declaration of Patrick Amole*, Dkt. No. 369 at ¶ 14.

[70]   *Declaration of Joe Scott*, Dkt. No. 368 at ¶¶ 15-16.

[71]   Id. at ¶ 18; see *Exhibit 19*.

had to be reported to the Commission.[72]   Reporting aside, Mr. Scott concedes that the Debtor's

clean-up was likely sufficient and that there are no immediate environmental concerns.[73]

The Debtor filed the *Motion* shortly after the two wells were re-sealed.[74]   It

theorized that the Commission violated the automatic stay by sealing 13 wells post-petition (an

oblique reference to the 2022 sealing) and sending the *June Letter*.[75]   The Debtor characterized

these acts as efforts to collect "fines and penalties."[76]   In contrast, the Commission asserted that

its actions, including the seals, fines, and bonding requirement, were meant to compel the Debtor's

compliance with its rules and discourage future violations.[77]   As a result, the Commission argued

that its conduct was an exempt exercise of its police and regulatory powers under section

362(b)(4).[78]

During the evidentiary hearing, Mr. Scott insisted that the bonding requirement

imposed on the Debtor is not in service of the Commission's pecuniary interests.[79]   He explained

that the compliance bond is not even a debt, but a prerequisite to operate wells in Wyoming.[80]

According to Mr. Scott, its purpose is to deter an operator such as the Debtor from violating the

Commission's rules by ensuring they have something to lose.[81]   The compliance bond guards

---

[72]   *Transcript of April 24, 2024 Hearing*, Dkt. No. 392 at 18:14-17.

[73]   Id. at 62:21-25, 65:19-23.

[74]   *Proposed Stipulated Facts*, Dkt. No. 249-1 at ¶ 14.

[75]   *Amended Expedited Motion to Enforce the Automatic Stay and Request for Sanctions*, Dkt. No. 154 at ¶ 28.

[76]   Id. at ¶¶ 27-28, 34.

[77]   *Wyoming Oil & Gas Commission's Objection to Debtor's Amended Expedited Motion for Order to Enforce Automatic Stay and Request for Sanctions*, Dkt. No. 176 at 16.

[78]   Id. at 20.

[79]   *Transcript of April 24, 2024 Hearing*, Dkt. No. 392 at 66:4-10; see *Declaration of Joe Scott*, Dkt. No. 368 at ¶ 9.

[80]   *Declaration of Joe Scott*, Dkt. No. 368 at ¶ 10.

[81]   *Transcript of April 24, 2024 Hearing*, Dkt. No. 392 at 60:1-8; see *Declaration of Joe Scott*, Dkt. No. 368 at ¶ 8.

against all potential rule violations, ranging from operational issues to environmental protection.[82]
While not meant to secure unpaid taxes, Mr. Scott "suppose[d]" that "technically" the Commission
could forfeit a bond for that reason after notice and hearing in accordance with the regulations.[83]
In any event, he emphasized that without bonding authority, the Commission is left without the
means to compel compliance with its rules, undermining its statutory mission.[84]  Mr. Scott did not
address the fines during his testimony.

When asked why the Debtor was permitted to operate without a bond between 2017
and 2021, Mr. Scott attributed it to the Debtor's lack of state wells.[85]   Although it is a rare
occurrence, a producer may continue to operate federal wells in Wyoming after its state wells have
been orphaned provided it complies with the Commission's rules.[86]  Once the Debtor committed
a "blatant violation" in 2020, and "essentially wrote that [it] was refusing to comply with the act,"
the Commission deemed a compliance bond necessary.[87]

As previewed above, Mr. Koval's testimony can be fairly characterized as
revisionist in almost every respect.  For example, he maintains that the Debtor has always complied
with the Commission's rules and that this is merely a dispute over a $53 tax.[88]  Mr. Koval excuses
any seeming defiance by opining (without basis) that the Commission lacks authority over federal

---

[82]   *Transcript of April 24, 2024 Hearing*, Dkt. No. 392 at 60:9-24; see *Declaration of Joe Scott*, Dkt. No. 368 at ¶ 11.

[83]   *Transcript of April 24, 2024 Hearing*, Dkt. No. 392 at 64:24-65:18, 75:15-19.

[84]   *Transcript of April 24, 2024 Hearing*, Dkt. No. 392 at 64:12-23; see *Declaration of Joe Scott*, Dkt. No. 368 at ¶ 12.

[85]   *Transcript of April 24, 2024 Hearing*, Dkt. No. 392 at 72:2-18.

[86]   Id.

[87]   Id. at 71:21-72:1.

[88]   Id. at 36:16-24, 41:23-42:7.

wells and, in any event, already holds more than $25,000 in bonds.[89]  Indeed, he demands the
return of the bonds with interest.[90]

Mr. Koval declared that the Commission's seals cost the Debtor an entire
production cycle and that it continues to suffer damage for each day the wells cannot operate.[91]
Still, he did not quantify that amount in his declaration and was not permitted to do so during the
hearing.[92]

At the end of the hearing, the Court took the matter under advisement and directed
the parties to file supplemental briefing.  Both did so timely.[93]  The matter is now ripe for
determination.

## II.   JURISDICTION

This Court has authority to exercise jurisdiction over the subject matter and the
parties under 28 U.S.C. §§ 157(a), 1334, and the Order of Reference entered by the United States

---

[89]   Id. at 32:5-14, 33:4-9, 35:2-24.

[90]   Id. at 35:2-5.

[91]   *Declaration of Eric Koval*, Dkt. No. 376 at ¶¶ 19-21.

[92]   *Transcript of April 24, 2024 Hearing*, Dkt. No. 392 at 22:11-26:15 (ruling that Mr. Koval's failure to
articulate damages in detail rendered further testimony beyond the scope of direct examination).  Allegedly,
the Debtor mistakenly believed that the Court would conduct a separate evidentiary hearing on damages.
Because the *Motion* was originally submitted on the pleadings, the Debtor's proposed order contemplated
that the *Motion* would be granted and an evidentiary hearing on damages scheduled.  See Dkt. No. 154-2 at
2.  Contrary to the Debtor's assertions, the *Motion* itself made no such request.  See *Black Diamond Energy
of Delaware's Post-Trial Brief in Support of Motion to Enforce Automatic Stay*, Dkt. No. 414 at 9 (stating
*without citation* that "BDED requested in its Motion a separate hearing on damages.").  Regardless, the need
for a separate hearing was obviated once the Court scheduled the *Motion* for an evidentiary hearing.  Put
simply, the Debtor requested and received an evidentiary hearing.  The scheduling order did not reserve any
issue for a later date, see *Order (A) Setting Discovery Deadlines and Other Related Dates and (B) Setting
Evidentiary Hearing Date*, Dkt. No. 221, and, needless to say, the Debtor cannot do so unilaterally.  While it
is sometimes efficient to bifurcate the trial of liability and damages, the Court would not have done so here
because the Commission was required to travel from Wyoming.  Accordingly, it was incumbent on both
parties to present their entire case at the hearing.

[93]   See *Respondent Wyoming Oil & Gas Conservation Commission's Supplemental Briefing*, Dkt. No. 411;
*Black Diamond Energy of Delaware's Post-Trial Brief in Support of Motion to Enforce Automatic Stay*, Dkt. No. 414.

13

District Court for the Western District of Pennsylvania on October 16, 1984. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A).

## III.   DISCUSSION

### A.   The Automatic Stay

As recognized by the United States Court of Appeals for the Third Circuit, "[t]he automatic stay is one of the fundamental debtor protections supplied by the Bankruptcy Code."[94] The automatic stay is a series of statutory injunctions codified in section 362(a) which arise automatically—that is, without a formal order—upon the commencement of a bankruptcy case.[95] In general, these injunctions are broad[96] and collectively bar acts to "obtain property of the debtor or property of the bankruptcy estate."[97] "It is designed to effect an immediate freeze of the *status quo*"[98] to, among other things, "halt all collection efforts in order to allow the debtor time to reorganize."[99]

Three provisions of section 362(a) are implicated here. First, section 362(a)(1) bars "the commencement or continuation . . . of a judicial, administrative, or other action or proceeding against the debtor . . . to recover a [prepetition] claim."[100] Next, section 362(a)(3) stays "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate."[101] "Property of the estate," of course, broadly encompasses "all legal

---

[94]   Univ. Med. Ctr. v. Sullivan (In re Univ. Med. Ctr.), 973 F.2d 1065, 1074 (3d Cir. 1992) (citing Cuffee v. Atl. Bus. & Cmty. Dev. Corp. (In re Atl. Bus. & Cmty. Dev. Corp.), 901 F.2d 325, 327 (3d Cir. 1990)).

[95]   11 U.S.C. § 362(a)(1)-(8).

[96]   ACandS, Inc. v. Travelers Cas. & Sur. Co., 435 F.3d 252, 259 (3d Cir. 2006).

[97]   Wingard v. Altoona Reg. Health Sys. (In re Wingard), 382 B.R. 892, 899 (Bankr. W.D. Pa. 2008).

[98]   Hillis Motors, Inc. v. Hawaii Auto. Dealers' Ass'n, 997 F.2d 581, 585 (9th Cir. 1993).

[99]   True Health Diagnostics LLC v. Azar (In re THG Holdings LLC), 604 B.R. 154, 160 (Bankr. D. Del. 2019).

[100]   11 U.S.C. § 362(a)(1).

[101]   11 U.S.C. § 362(a)(3).

or equitable interests of the debtor in property as of the commencement of the case."[102]  Finally,

section 362(a)(6) prohibits "any act to collect, assess, or recover a [prepetition] claim against the

debtor."[103]

Generally, the automatic stay applies to "all entities,"[104] including "governmental

units."[105]  So when the government is acting as a creditor, it is subject to the same limitations as

applicable to other creditors.[106]   Yet Congress "return[ed] . . . with one hand some of what was

taken away by the other."[107]  As explained by the United States Court of Appeals for the Third

Circuit:

> Congress recognized . . . that the stay provision was particularly
> vulnerable to abuse by debtors improperly seeking refuge under the
> stay in an effort to frustrate necessary governmental functions. To
> combat the risk that the bankruptcy court would become a sanctuary
> for . . . wrongdoers, among others, Congress enacted the police and
> regulatory power exception to the automatic stay.[108]

To help ensure "the automatic stay in bankruptcy is a shield and not a sword designed to afford a

party with a litigation advantage"[109] section 362(b)(4) excepts from the stay

> the commencement or continuation of an action or proceeding by a
> governmental unit . . . to enforce such governmental unit's or
> organization's police and regulatory power, including the

---

[102]    11 U.S.C. § 541(a)(1); see also United States v. Whiting Pools, Inc., 462 U.S. 198, 204-05, 103 S.Ct. 2309,
2313, 76 L.Ed.2d 515 (1983) ("The House and Senate Reports on the Bankruptcy Code indicate that §
541(a)(1)'s scope is broad."); Westmoreland Human Opportunities, Inc. v. Walsh, 246 F.3d 233, 241 (3d Cir.
2001) ("§ 541(a)'s legislative history demonstrates that the language of this provision was intended to sweep
broadly ....").

[103]    11 U.S.C. § 362(a)(6).

[104]    11 U.S.C. § 362(a).

[105]    11 U.S.C. § 101(15).  Sovereign immunity is expressly abrogated as to governmental units with respect to
section 362.  See 11 U.S.C. § 106(a)(1).

[106]    See In re Univ. Med. Ctr., 973 F.2d at 1074; In re THG Holdings LLC, 604 B.R. at 160.

[107]    Penn Terra Ltd. v. Dep't of Env't Res., Com. of Pa., 733 F.2d 267, 272 (3d Cir. 1984).

[108]    United States v. Nicolet, Inc., 857 F.2d 202, 207 (3d Cir. 1988).

[109]    Cnty. of Allegheny v. The Cracked Egg, LLC (In re The Cracked Egg, LLC), 624 B.R. 84, 88–89 (Bankr.
W.D. Pa. 2021).

> enforcement of a judgment *other than a money judgment*, obtained
> in an action or proceeding by the governmental unit to enforce such
> governmental unit's or organization's police or regulatory power.[110]

Basically, this provision embodies an awareness that debtors must generally abide by applicable laws[111] and that some laws "merit[] a higher priority than the debtor's rights to a 'cease fire.'"[112]

To determine whether a governmental act falls within the police and regulatory power exception, the Third Circuit applies "two 'related, and somewhat overlapping' tests."[113] The first "asks whether the government primarily seeks to protect a pecuniary governmental interest in the debtor's property, as opposed to protecting the public safety and health."[114] The second considers "whether the government is effectuating public policy rather than adjudicating private rights."[115] Only actions whose "primary purpose is to 'promote public safety and welfare or to effectuate public policy'" are excepted from the stay.[116] As such, the court must "get to the heart of the reasoning behind the government's actions [and] avoid relying on unsupported statements of intent."[117]

---

[110] 11 U.S.C. § 362(b)(4) (emphasis added).  The police power exception was previously codified in sections 362(b)(4) and (5) before being consolidated into a single subsection in 1998.  See, e.g., In re Bankr. Appeal of Allegheny Health, Educ. & Rsch. Found., 252 B.R. 309, 323 (W.D. Pa. 1999).  Since this change was not material, courts agree that the pre-1998 cases remain good law.  See In re Iezzi, 504 B.R. 777, 784 n.7 (Bankr. E.D. Pa. 2014).

[111] In re The Cracked Egg, LLC, 624 B.R. at 88 (citing 28 U.S.C. § 959(b), which provides that "a debtor in possession, shall manage and operate the property in his possession as such trustee, receiver or manager according to the requirements of the valid laws of the State in which such property is situated, in the same manner that the owner or possessor thereof would be bound to do if in possession thereof.").

[112] United States v. Nicolet, Inc., 857 F.2d at 207.

[113] In re Nortel Networks, Inc., 669 F.3d 128, 139 (3d Cir. 2011) (quoting Lockyer v. Mirant Corp., 398 F.3d 1098, 1108 (9th Cir. 2005)).

[114] Id. at 139-40.

[115] Id. at 140.

[116] Id.; see also Al Stewart v. Holland Acquisitions, Inc., No. 2:15-CV-01094, 2021 WL 1037617, at *2 (W.D. Pa. Mar. 18, 2021) (quoting id.)

[117] In re THG Holdings LLC, 604 B.R. at 161; see also In re Nortel Networks, Inc., 669 F.3d at 140 ("Instead of making a broad generally applicable pronouncement as to how the police power exception should be interpreted, we must look to the purpose of the proceeding at issue.").

Ultimately, a corporate debtor[118] "injured by any willful violation of a stay . . . shall recover actual damages, including costs and attorneys' fees."[119] A stay violation is "willful" if the creditor commits an intentional act that violates the stay with knowledge that a bankruptcy petition has been filed.[120] No specific intent to violate the stay is required.[121] To recover damages under section 362(k), a debtor must establish three elements by a preponderance of the evidence: (1) a stay violation occurred; (2) the act giving rise to the violation was willful; and (3) the violation caused injury.[122] Although an act excepted from the automatic stay is by definition not a stay violation, the government logically must have the initial burden to show section 362(b)(4) applies.[123] Naturally, to the extent that the Debtor challenges the government's showing, it must do so with compelling evidence to carry its ultimate burden to show a stay violation.

B.      Analysis

The Debtor alleges four violations of the automatic stay: (1) the July 2022 sealing of the wells; (2) the July and August 2022 orders scheduling and then continuing a severance tax

---

[118]    In re Atl. Bus. & Cmty. Corp., 901 F.2d at 329; Roberts v. Vara (In re Roberts), No. 21-20618-JAD, 2024 WL 2050561, at *11 n.11 (Bankr. W.D. Pa. May 8, 2024); AUA Private Equity Partners, LLC v. Kind Operations, Inc. (In re Pa Co-Man, Inc.), 654 B.R. 92, 96 (Bankr. W.D. Pa. 2023); Prithvi Catalytic, Inc. v. Microsoft Corp. (In re Prithvi Catalytic, Inc.), 571 B.R. 105, 143 n. 220 (Bankr. W.D. Pa. 2017); Böhm v. Howard (In re Howard), 428 B.R. 335, 338 (Bankr. W.D. Pa. 2010), aff'd, No. 2:10CV962, 2011 WL 578777 (W.D. Pa. Feb. 9, 2011).

[119]    11 U.S.C. § 362(k)(1). This provision was previously codified as section 362(h) but re-codified in 2005 as section 362(k)(1) as part of BAPCPA. Because the provisions are identical, prior caselaw regarding section 362(h) is remains relevant to the application of section 362(k)(1). Wingard v. Altoona Reg. Health Sys. (In re Wingard), 382 B.R. 892, 900 n.5 (Bankr. W.D. Pa. 2008).

[120]    Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp., 337 F.3d 314, 320 n.8 (3d Cir. 2003); In re Univ. Med. Ctr., 973 F.2d at 1088.

[121]    In re Atl. Bus. & Cmty. Corp., 901 F.2d at 329 (quoting Goichman v. Bloom (In re Bloom), 875 F.2d 224, 227 (9th Cir. 1989)).

[122]    See In re Prithvi Catalytic, Inc., 571 B.R. at 143; In re Wingard, 382 B.R. at 900.

[123]    As the Debtor notes, the caselaw is curiously silent on which party bears the burden of proving the police and regulatory power exception applies. See Black Diamond Energy of Delaware's Post-Trial Brief in Support of Motion to Enforce the Automatic Stay, Dkt. No. 414 at 6-7. Despite the Court's request, the Commission did not brief the issue. The Court's own research suggests the point is typically moot since governmental units have an incentive to vigorously defend their conduct.

enforcement hearing; (3) the *June Letter*; and (4) the June 2023 re-sealing of the wells.  The

Commission contends all these acts fall within the police and regulatory powers exception to the

stay.  The Commission qualifies as a "governmental unit" for purposes of section 362(b)(4)[124] and

"exercises the police power of the State of Wyoming when it issues its orders."[125]  Still, the Debtor

argues the Commission only furthered a "pecuniary purpose since the underlying basis of the

orders [was] the collection and reporting of taxes."[126]  In the Court's view, however, both parties

paint with too broad a brush.  This dispute is layered, requiring a nuanced analysis of each

governmental act and its objective.

From the outset, the alleged stay violations based on the tax enforcement orders can

be quickly disposed of because the Debtor neither established a willful violation nor a related

injury.  Although the Commission was clearly pursuing its pecuniary interest in unpaid taxes, the

record reflects that it was unaware of the Debtor's bankruptcy when the enforcement hearing was

first noticed.  The Commission then remedied this technical stay violation, though weeks later, by

continuing the tax enforcement hearing generally.  In other words, everything worked out as it

should since the hearing did not take place.  But even assuming the Commission's three-week

delay was itself willful, the Debtor has not shown it was harmed.

The remaining alleged violations relate to the post-petition sealing (and re-sealing)

of oil and gas wells in which the estate has a property interest generally protected by the automatic

stay.[127]  All stem from the same root: *Order 205-2021*.  The seals were authorized by *Order 459-*

*2022* and affixed post-petition because the Debtor violated *Order 205-2021*.  And for its part, the

---

[124]   See 11 U.S.C. § 101(27).

[125]   Union Pac. Res. Co. v. Texaco, Inc., 882 P.2d at 223.

[126]   *Black Diamond Energy of Delaware's Post-Trial Brief in Support of Motion to Enforce the Automatic Stay*,
Dkt. No. 414 at 7.

[127]   See 11 U.S.C. § 541(a).

*June Letter* reiterates that the wells will remain sealed until that occurs.  Therefore, if the purpose of the seals was to enforce *Order 205-2021*, then the Court must discern what it required and why.

There are two outstanding components of *Order 205-2021*: a $5,000 fine and the requirement to post a $25,000 bond.[128]  Notably, the Commission has never sought to enforce them separately, though they are analytically distinct and must be seen as such.  That said, the seals are justified so long as at least one of the unsatisfied requirements of *Order 205-2021* has a primarily non-pecuniary purpose.

Turning first to the $5,000 fine, the Court finds that the Commission has not shown that the enforcement of this piece of *Order 205-2021* is excepted from the stay.  The Commission levied this fine because the Debtor's tax reporting and payments were untimely.[129]  Relying on *United States v. Sugarhouse Realty, Inc.*, the Commission asserts that the assessment of "fines constitute[s] a 'regulatory action in the purest sense.'"[130]  True enough, but the exception only extends to "efforts to *fix* a penalty," not collect one.[131]  Section 362(b)(4) expressly forbids the "enforcement" of a money judgment.[132]  In *Penn Terra Ltd. v. Dep't of Env't Res., Com. of Pa.*, the Third Circuit explained that section 362(b) distinguishes the "entry of a money judgment" from "attempts to seize property . . . in order to satisfy that judgment."[133]  While all civil penalties

---

[128]  See *Exhibit 2* at 6.  The Commission seemingly concedes that the Debtor has corrected its reporting and payment deficiencies as required by *Order 205-2021*.  See *Transcript of April 24, 2024 Hearing*, Dkt. No. 392 at 62:4-10.

[129]  *Exhibit 2* at ¶ 9.

[130]  *Respondent Wyoming Oil & Gas Conservation Commission's Supplemental Briefing*, Dkt. No. 411 at ¶¶ 17-18 (quoting United States v. Sugarhouse Realty, Inc., 162 B.R. 113, 115 (E.D. Pa. 1993)).

[131]  New Jersey v. W.R. Grace & Co. (In re W.R. Grace & Co.), 412 B.R. 657, 664 (D. Del. 2009) (emphasis added); see United States v. Nicolet, Inc., 857 F.2d at 208-09; Penn Terra Ltd. v. Dep't of Env't Res., Com. of Pa., 733 F.2d at 273; U.S. v. LTV Steel Co., Inc., 269 B.R. 576 (W.D. Pa. 2001); United States v. Sugarhouse Realty, Inc., 162 B.R. at 116-17.

[132]  See 11 U.S.C. § 362(b)(4).

[133]  Penn Terra Ltd. v. Dep't of Env't Res., Com. of Pa., 733 F.2d at 275.

provide some deterrent effect, the $5,000 fine is basically a liquidated damage for a past wrong—a prototypical money judgment.[134]   Therefore, seeking "compliance" with this part of *Order 205-2021* really is an impermissible attempt to collect a prepetition debt.[135]

In comparison, the $25,000 bond requirement is a much different animal.   The bond's stated purpose is to provide "*security for [the Debtor's] future compliance* with the Commission's Rules and orders."[136]   Recall that the Commission not only found that the Debtor's tax reporting was repeatedly untimely, inaccurate, and unaccompanied by payments, but that the Debtor *refused* to pay without an offset.[137]   Confronted with chronic, willful rule violations, the Commission concluded that the Debtor needed some skin in the game and the State Court affirmed the decision as well-supported by substantial evidence.[138]   Therefore, the bonding requirement facially advances the Commission's non-pecuniary interest in the enforcement of its rules and orders.

Nevertheless, the Debtor urges the Court to find a primarily pecuniary purpose by focusing on the rules whose compliance the bond was meant to compel.   In its view, this dispute is limited to the reporting and payment of tax obligations because those are the rules the Debtor violated.[139]   Frankly, this might have been a better argument in July 2022 than it is on this record. Since the petition date, the Debtor has defied the Commission and its rules by removing seals, returning its wells to production, and failing to report two separate oil spills.[140]   To top it off, Mr.

---

[134]   See id. at 277.

[135]   The Commission did not file a proof of claim for the $5,000 fine and the time to do so has now passed.

[136]   *Exhibit 2* at 6.

[137]   Id. at 5-6.

[138]   See *Exhibit 5*; *Exhibit 6* at 8-9.

[139]   See WY Oil & Gas Conservation Comm'n Rules, Ch. 3, §§ 41(a), (c).

[140]   See *Transcript of April 24, 2024 Hearing*, Dkt. No. 392 at 37:7-21, 73:23-74:5; *Declaration of Patrick Amole*, Dkt. No. 369 at ¶¶ 13-14; *Declaration of Joe Scott*, Dkt. No. 368 at ¶¶ 15-16.

Koval baselessly contends the Debtor need not comply with the Commission and its rules.[141]  The

Debtor and Mr. Koval also had prior incidents of non-compliance with the Commission's rules

that resulted in the forfeiture of the bonds that started this dispute.[142]  And, of course, the Debtor

did not merely flout some technical tax rule, but thumbed its nose at the Commission over a prior

grievance.  So it is disingenuous to suggest the Commission's enforcement interest against the

Debtor must be narrow when the Debtor's non-compliance has been much broader.  The Court is

unpersuaded that a compliance bond's purpose should be second guessed when the government's

jurisdiction is comprehensive and serves ongoing public policy interests.  Put simply, the Court

declines to view the Commission as a mere tax collector.

> Still, the Debtor doubles-down, rejecting the notion that the Commission has the

authority to require a compliance bond under these circumstances.[143]  The Debtor explains the

"flaw" in the Commission's interpretation of the Act as follows:

> [T]he plain language . . . only allows for a surety bond or other
> guaranty to be required as a condition or to secure performance *in
> relation to a rule or order* regarding (i) plugging a dry or abandoned
> well, or (ii) repairing a well causing waste.  If the drafters intended
> a general authority to allow a bond for any compliance with rules
> and order, then it would have separately delineated that authority.
> To the extent [the Commission] has any independent bonding
> authority, it is limited only to compliance related to plugging a dry
> or abandoned well, or repairing a well causing waste.[144]

This, however, is a *gross misrepresentation* of the statute.  The Act actually provides:

---

[141]   See *Transcript of April 24, 2024 Hearing*, Dkt. No. 392 at 32:5-14; 33:4-20.  Significantly, the Debtor's
briefing has not endorsed this position as its own.  The Debtor has not come forward with any authority
describing the impact of federal jurisdiction on the Commission's authority to regulate federally-leased wells
in Wyoming.

[142]   See id. at 26:17-29:5; *Declaration of Joe Scott*, Dkt. No. 368 at ¶¶ 20-22; *Proposed Stipulated Facts*, Dkt.
No. 249-1 at ¶ 2.

[143]   See *Black Diamond Energy of Delaware's Post-Trial Brief in Support of Motion to Enforce the Automatic
Stay*, Dkt. No. 414 at 7-8.

[144]   Id. at 8 (citing Wy. Stat. Ann. § 30-5-104(d)(i)(D)) (emphasis added).

> The commission has the authority . . . [t]o require . . . [t]he furnishing of a surety bond or other guaranty, conditioned for or securing the performance of the duty to plug each dry or abandoned well or the repair of wells causing waste ***and compliance with the rules and orders of the commission.***[145]

Based on the position of the conjunctive "and," a surety bond plainly secures "the performance of [well duties] *and* compliance with the rules and orders of the commission."[146]  The Debtor's "plain language" reading so materially deviates from the statutory text towards a desired outcome that it does not seem to be a mistake.  Regardless, the drafters expressly granted the Commission authority to require a bond as "security for . . . future compliance with the Commission's Rules and orders."[147]

Undaunted, the Debtor asserts that the Commission has not pointed to any statutory authority that would permit it to require additional surety for wells under federal jurisdiction.  Not so,[148] but this argument would seem foreclosed by the *Rooker-Feldman* doctrine.[149]  It bars an

---

[145]    Wy. Stat. Ann. § 30-5-104(d)(i)(D) (emphasis added).

[146]    Id.

[147]    *Exhibit 2* at 6.

[148]    The Commission cites section 30-5-118 of the Act, which provides in relevant part:

> [T]his act shall apply to all lands in the state of Wyoming lawfully subject to its police powers; provided, it shall apply to lands of the United States *or to lands subject to the jurisdiction of the United States only to the extent that control and supervision of conservation of oil and gas by the United States on its lands shall fail to effect the intent and purposes of this act* and otherwise shall apply to such lands to such extent as an officer of the United States having jurisdiction, or his duly authorized representative, shall approve any of the provisions of this act or the order or orders of the commission which affects such lands . . .

> Wyo. Stat. Ann. § 30-5-118.  At the very least, this provision establishes that the Act applies to federal wells in Wyoming under some circumstances.  If an operator of federal wells must comply with the Act, it logically follows that the Commission must have the authority to enforce it.  Therefore, the Court finds that the burden shifted to the Debtor to refute the Act's applicability here.  To be clear, this necessitated something more compelling than Mr. Koval's bare denials.

[149]    The doctrine takes its name from the only two cases in which the Supreme Court has applied it to defeat federal subject-matter jurisdiction: <u>Rooker v. Fidelity Trust Co.</u>, 263 U.S. 413, 44 S. Ct. 149, 68 L. Ed. 362 (1923), and <u>District of Columbia Court of Appeals v. Feldman</u>, 460 U.S. 462, 103 S. Ct. 1303, 75 L. Ed. 2d 206 (1983).

inferior federal court from "from exercising jurisdiction over cases brought by 'state-court losers'

challenging 'state-court judgments rendered before the district court proceedings commenced.'"[150]

Here, the Debtor unsuccessfully appealed *Order 205-2021* to the State Court, which expressly held

"[t]he Commission did not exceed its statutory authority when it issued a bond in this case."[151]  It

is not this Court's place to reject those findings now.[152]

   Taking a step back, the compliance bond is not a debt, but a prerequisite to the

Debtor operating oil and gas wells in Wyoming.  It does not matter that it was seemingly imposed

here as a sanction rather than mandated from the start.  The fundamental purpose of the compliance

bond is to ensure the Debtor follows *all* the Commission's rules and orders going forward, not just

the tax rules.  There is no question these rules effectuate important public policy interests by

ensuring oil and gas operators produce these resources safely and equitably, and without waste or

environmental damage.[153]  And the compliance bond's future focus distinguishes it from a money

judgment.[154]  In essence, it is the cost of admission and the inability to operate wells is the natural

consequence of choosing not to provide the surety.  From this perspective, the Debtor's attempt to

use the stay to avoid supplying a compliance bond seems more a sword than a shield.[155]

   Finally, the Court observes that no evidence shows that the Commission holds any

remaining funds from the forfeited bonds to which the Debtor would be entitled.  As such, the

---

[150] Lance v. Dennis, 546 U.S. 459, 460, 126 S. Ct. 1198, 1199, 163 L. Ed. 2d 1059 (2006) (quoting Exxon Mobil Corp. v. Saudi Basic Industries Corp., 544 U.S. 280, 284, 125 S.Ct. 1517, 161 L.Ed.2d 454 (2005)).

[151] *Exhibit 6* at 12.

[152] See Great W. Mining & Mineral Co. v. Fox Rothschild LLP, 615 F.3d 159, 166 (3d Cir. 2010) (quoting Exxon Mobil, 544 U.S. at 284).

[153] See generally Wyo. Stat. Ann. § 30-5-104.

[154] See Penn Terra Ltd. v. Dep't of Env't Res., Com. of Pa., 733 F.2d at 277 ("it is unlikely that any action which seeks to prevent culpable conduct *in futuro* will, in normal course, manifest itself as an action for a money judgment, or one to enforce a money judgment.").

[155] See In re The Cracked Egg, LLC, 624 B.R. at 88–89.

Debtor has not established that it satisfied the compliance bond requirement of *Order 205-2021* before the Commission sealed the wells.[156]

      For all these reasons, the Court finds that the sealing of the Debtor's wells to compel the provision of the compliance bond required by *Order 205-2021* was an excepted exercise of the Commission's police and regulatory powers.[157]  As a result, the Debtor has not established a violation of the automatic stay.

## IV.    CONCLUSION

      Based on the foregoing, the *Motion* must be denied.  This opinion constitutes the Court's findings of fact and conclusions of law in accordance with Fed. R. Bankr. P. 7052.  The Court will issue a separate order consistent with this opinion.

      ENTERED at Pittsburgh, Pennsylvania.

Dated: November 27, 2024

GREGORY L. TADDONIO
CHIEF UNITED STATES BANKRUPTCY JUDGE

Case administrator to mail to:
Debtor

---

[156]   The Court notes this because Mr. Koval made this point during his testimony even if the Debtor did not clearly adopt this position.

[157]   The parties have not mentioned the monthly fines imposed by *Order 459-2022*.  The Court presumes this is because there is no evidence that the Commission tried to collect them.  In any event, the assessment of the fines by itself does not violate the stay.  See In re W.R. Grace & Co., 412 B.R. at 664.